### HARRELL et al. v. WALSH et al.
### No. 14448.

Court of Civil Appeals of Texas. Dallas.
April 11, 1952.

Rehearing Denied June 6, 1952.

928

Coke & Coke, Thomas G. Murnane and W. B. Harrell, all of Dallas, Bryan Marsh, Ramey, Calhoun, Marsh, Brelsford & Sheehy, all of Tyler, for appellants.

Saner, Jack & Sallinger, and McGillivray Muse, all of Dallas, for appellee.

BOND, Chief Justice.

Mrs. Emma Walsh, surviving widow of Col. C. C. Walsh, deceased, individually and as Independent Executrix and Trustee of her husband's estate, seeks to recover judgment for title and possession of all real estate and personal property owned and possessed by Mrs. John T. Riggs, deceased, at the time of her death, other than certain specific bequests, and in the alternative for damages to the value thereof, or damage for business and legal services rendered by Mr. Walsh to Mrs. Riggs upon an implied or quantum meruit contract, against W. B. Harrell, Independent Executor of the will of Mrs. Riggs, and against Nathan Adams, David Reed, Frank Ellis McGonagill, Jr., Marvin Methodist Church of Tyler, Texas and its Trustees, and the American Red Cross, beneficiaries under subsequent will of Mrs. Riggs.

The facts in this case are not materially in dispute. The record reveals a question of law exists, (1) as to whether there was an irrevocable testamentary contract in form of will executed by Mrs. Riggs, in 1939, as would survive the death of Mr. Walsh; (2) whether there was a mutual understanding and agreement between Mr. Walsh and Mrs. Riggs that for the services Mr. Walsh was rendering her, she (Mrs. Riggs) was to compensate him by remembering him in her will; and (3) whether for the services rendered by Mr. Walsh, he intended to charge Mrs. Riggs and Mrs. Riggs intended to pay Mr. Walsh by will for such services, or, in effect, a legal obligation to do so. It is not contended by the plaintiff (appellee) that there exists any muniment of title, or any evidence of any kind to show legal title in the estate of Mr. Walsh; but rather one created from the conduct and relations of the parties as to indicate common understanding, mutual intent, and assent to terms and conditions, culminating in a testamentary contract in form of will executed by Mrs. Riggs in 1939,—and which was breached by her subsequent will.

A contract implied, includes the essential element of mutual agreement or assent. A promise, knowledge on the part of the promisor as to what the promisee expected in the matter, is immaterial. "It devolves upon a person seeking to recover upon an implied contract to establish facts and circumstances from which the law will imply a promise. Where the evidence is undisputed, the question as to whether or not it shows an implied contract is one of law for the court." 10 Tex.Jur., sec. 8, pp. 19, 20, 21.

"An expression of intention to do a particular thing is not a promise to do it; it is to be distinguished from a promise. Intention is but the purpose which one forms in his own mind, and which may begin and end with the person who forms it, whereas a promise is an express undertaking or agreement to carry a purpose into effect. It has been said that the distinction lies in the fact that an expression of intention is merely an evidence of the condition of the mind with respect to future action, which concerns only the individual entertaining it, and which no one has the right to require him to execute, while a promise is intended to give some other person an assurance, which he will be expected to rely on, that the act will actually be done or refrained from." 10 Tex.Jur., p. 15, sec. 4. Intention is always a necessary element of contract. Hoffmann v. Chapman, Tex.Civ.App., 170 S.W.2d 496, error refused.

The foremost question here for our consideration is whether there is sufficient evidence to raise an issue of fact on the essential element of liability of Mrs. Riggs'

estate for damages as found by the jury, and carried into the judgment of the trial court for the value of Mr. Walsh's services to Mrs. Riggs, deceased. That is, on quantum meruit, and whether or not such claim, if any, is barred by the two and four-year statutes of limitation, or inhibited by statute of frauds. Vernon's Ann. Civ.St. arts. 5526, 5529, 3995.

The record evidence shows that over a period of more than twenty years Mr. Walsh was a personal, financial and business representative of Mrs. Riggs; that he skillfully managed her estate; rendered her unerring advice, personal and financial aid and assistance up to the time of his death, December 23, 1943. Mr. Walsh was by nature a philanthropist, a highly educated man, a profound lawyer, a Christian gentleman, successful banker, and experienced business man. In early manhood he practiced law in various towns of Texas but soon directed his entire attention to banking and business enterprises, and ofttimes took time off from his business affairs to aid and assist acquaintances, friends, and banking customers in their varied financial difficulties; wrote leases, contracts, deeds, deeds of trust, and other legal documents for them. There is no evidence that he ever charged anyone or received pay for such valued services. In some instances Mr. Walsh was remembered by will;—no contract obligation.

Mr. Walsh's services to Mrs. Riggs dated back to about 1920 when he and Mrs. Riggs were citizens of San Angelo, Texas. There Mr. Walsh was exclusively engaged in the banking business, President of the Citizens National Bank; never practiced law there or held himself out as a lawyer; he knew Mrs. Riggs well and after the death of her husband which occurred in about 1922, he became more intimate with her as a customer of his bank and with all her financial difficulties, delinquent notes, etc., which she was unable to pay, deeds of trust against her real estate and foreclosure proceedings thereon. On the death of her husband, Mrs. Riggs needed someone to advise and counsel with her. She had one daughter, Julia May, wife of Frank McGonagill, a resident of Fort Worth, Texas

and one sister, Mrs. Adams, living at Tyler, Texas. She reposed the utmost trust in Mr. Walsh's honesty and business ability. She never employed him in any court matters and Mr. Walsh never represented her as a lawyer in any court or legal proceedings.

In 1925 Mr. Walsh was called to Dallas as Chairman of the Board of the Federal Reserve Bank and while there, until his death, continued his friendly administration of Mrs. Riggs' personal and financial affairs. The extent of such services is fully portrayed in mass of letters, copies of numerous legal documents, such as contracts, leases, releases, mortgages, and similar instruments prepared by Mr. Walsh; stacks of letters from Mrs. Riggs to Mr. Walsh and letters from Mr. Walsh to Mrs. Riggs, and vast number of letters and telegrams to and from Mr. Walsh to third parties in connection with and incident to Mrs. Riggs' affairs;—much of which is immaterial here. Also copies of income tax returns as well as many other documents passing from Mr. Walsh and Mrs. Riggs during 1927 to 1943. It would be impossible to enumerate in an opinion of reasonable length the amount of time, thought, and detailed work of personal nature performed by Mr. Walsh for Mrs. Riggs as shown in mass of 494 exhibits and bulk of private letters which passed between them. Suffice to say that such reflect the extensive services rendered by Mr. Walsh as well as Mrs. Riggs sincere appreciation of same.

There is nothing in the record from which the propriety of Mr. Walsh's making a charge against Mrs. Riggs for his services could be questioned; but, manifestly, had he wished to make such charges, he would not have let the matter rest in uncertainty. Mr. Walsh was an able lawyer, ethical in all his dealings; and being the business manager and confidential adviser of Mrs. Riggs, it was his duty to advise her of her responsibilities and legal obligations to him. And not having done so, it may reasonably be assumed that he entertained no thought of holding Mrs. Riggs liable for the services he rendered to her. It would be far afield to entertain

the thought that Col. Walsh, standing in such confidential relationship to a widow of 75 or 80 years of age, would surreptitiously exercise imposition by fraudulent means and over-reach Mrs. Riggs as would render a contract between them void, or presumptively to be invalid or called in question because of his relationship. Mrs. Riggs, on the other hand as reflected from her letters to Mr. Walsh, was grateful for the friendly services and advice given her by Mr. Walsh and often expressed her desire to remunerate him, but he consistently refused to accept pay for his services and expressly repudiated the idea. Evidently she, too, entertained no impelling legal obligation to remunerate him by will of her property.

Continuing the record evidence:

Marie Kennedy testified that she was a stenographer working for Federal Reserve Bank, Dallas, about 1925, and at that time became acquainted with Mr. Walsh; that she did his stenographic work until May 1936 and during that time she was acquainted with, and had several conversations with Mrs. Riggs in which Mrs. Riggs told Col. Walsh that he was entitled to every penny of her estate; that she wouldn't have a penny but for him, he enabled her existence, and everything she had, Mr. Walsh accumulated it for her; that he enabled her to maintain a standard of living which would not have been possible otherwise; that she was most grateful to him for such services. The witness further testified that Mr. Walsh told Mrs. Riggs in her presence "that the reason he was handling her estate in the manner in which he was, and the reason he was not charging her any fees, was that he wanted her to enjoy life and to get the most out of what she had, and that so long as she lived he did not expect compensation * * * that he was agreeable to her remembering him, if she saw fit, after she passed on." She further testified that Mrs. Riggs told her, "Colonel Walsh was not charging her for the handling of her affairs, but that she felt that she was deeply indebted to him and she intended to take care of him and remember him in her will." She recounted these things, she

said, to Col. Walsh on more than one occasion.

Mrs. Ruby Weis, another stenographer, testified that she went to work for Col. Walsh in January 1938 and continued working for him until February 1941. She related beneficial services rendered by Mr. Walsh to Mrs. Riggs. She testified that in 1939 Mrs. Riggs called Col. Walsh and made an appointment; "she came up and went in Col. Walsh's office and she was in there quite some time, maybe two or three hours. * * * And then she left and he (Col. Walsh) called me in and told me he wanted to dictate. So I went in to take dictation, and so he said: 'I want to dictate Mrs. Riggs' will.' I said, 'All right.' So he started out like he always dictated wills; so he finished the bequest she had made to her sister, I believe, and her son-in-law, and then she came to the disposition of her other property, and so when he got to that part of it, he said, 'Now, this may be a surprise to you.' I said, 'Well, maybe so,' and he said, 'Guess what she did with the remainder of the property?' I said, 'Well, I don't know.' So he said, 'Well, she left it to me.' I said, 'Well, I am not surprised, because she had already told me so, that she was going to leave it to you.' He said, 'Well, I knew she was going to leave me something, because she told me so, but I didn't know it was going to be the rest of the estate.' We went on and talked about it. He said, 'Well, I am entitled to it.' I said, 'You certainly are.' * * * We talked at some length about it, and I said, 'Well, you are entitled to it. You made it for her.'" The witness further testified: "Q. Then from his dictation, did you prepare a will for Mrs. Riggs? A. Yes, I did. Q. State whether or not she came back to the office later? A. She did. I know it wasn't that day, and I don't believe it was the next, but I know it wasn't long, because I immediately typed it out, and when she came in I gave it to Colonel Walsh. * * * It was either in the spring or early summer, as well as I can remember, of 1939. * * * Well, I had typed it and taken it in to Colonel Walsh, and so

when Mrs. Riggs came, he closed his office door and they were in there about an hour or so, and so then he opened the door and asked me to come in and I went in and he said, 'Well, Mrs. Riggs' will is all right,' and she said, 'That is the way I want it.' He said, 'Would you get some witnesses?' * * * She asked us would we witness her will, and we said we would be glad to." The witness also testified that Mrs. Riggs signed the will, the witnesses signed in the presence of each other and in the presence of Mrs. Riggs. "Q. What did she say about it? A. She said she was happy to get it over with, that she should have done it a long time ago and hadn't, and that her mind was relieved." Col. Walsh then gave the will to Mrs. Riggs, but she gave it back to him and told him to keep it for her in his safe deposit box. Mrs. Weis further testified that "Mrs. Riggs went out and she came back * * *. She came into my office * * *. She said, 'I have today done something I have wanted to do for years, but you know, you keep putting things off.' She said, 'Now I can die in peace, because I have done what I feel I should have done.' She said, 'That is the way I wanted it and that is the way I am going to have it.' * * * She told me of the work he had done for her over all these years * * * and that even though she had tried to pay him, he wouldn't accept it, because the amount of income she had coming from her property, that it took all of that for to live on, and that if he sold her capital investment she wouldn't have anything left to see her through in case she got sick or had to go to the hospital, or something." The witness further testified that she repeated to Col. Walsh the statements Mrs. Riggs had made to her, and that Col. Walsh said he deserved it, he had earned it.

Mrs. Mildred Congdon testified that she went to work for Col. Walsh in February 1940, succeeding Mrs. Ruby Weis; worked for him until his death; that she met Mrs. Riggs often; that Mrs. Riggs was very elderly, around 75 or 80 when she first met her in 1940; that she assisted Mr. Walsh in handling Mrs. Riggs' affairs. She then gave detailed account of the work she had done for Mr. Walsh and Mrs. Riggs. Further, she said that she was present when Mrs. Riggs and Mr. Walsh made statements as to the services she received from Mr. Walsh, relating: "I don't believe there was a single time that I ever went to Mrs. Riggs' apartment with Col. Walsh that she did not in some way express her deepest gratitude"; that "she told me she had never paid Col. Walsh for all that he had done for her, but that she was going to take care of him when she passed on; that *he did not want her to pay him anything*, because she might need it before she died * * *." (Emphasis added.)

The carbon copy of the purported 1939 document, or will, dictated by Col. Walsh to his stenographer (Mrs. Weis), was admitted in evidence over the timely objection of the defendants. The original document, if any, was never found among the effects of Mrs. Riggs, hence never probated. The pertinent provisions of such document read:

"Know All Men By These Presents: That I, Zaidee Trevanion Riggs, widow of the late John F. Riggs, deceased, being of sound mind and disposing memory, do hereby make, declare and publish this my Last Will and Testament, * * *.

"Item First

* * * * * *

"Item Second

"As to my worldly goods and all of the property of which I may die seized and possessed, be the same real, personal or mixed, and wheresoever situated, I will, devise and bequeath in the following manner, *and in no other*, to wit:

"Item Third

* * * * * *

"Item Fourth

"I hereby will, devise and bequeath to my beloved sister, Mrs. Mary Blanche Adams, a widow residing in Tyler, Texas as follows: In the event my sister, Mary Blanche Adams, shall be living at the date of my death, I hereby direct that my executor, hereinafter named, shall, as soon as it is

convenient for him to do so, pay to her in cash the sum of Ten Thousand Dollars ($10,000.00) taking her receipt therefor as an evidence of such payment when made.

## "Item Fifth

"First: I hereby will, devise and bequeath unto Frank McGonagill, a resident of Fort Worth, Texas, and the former husband of my beloved daughter, Julia May Riggs, the sum of Five Thousand Dollars ($5,000.00), to be paid to him by my executor, hereinafter named, as soon' as convenient in the due course of the administration of my estate. I make this bequest in sincere thanks and appreciation of Frank McGonagill's kindness and courtesy to me at all times covering a period of more than twenty-two years. His attitude toward me since the date of his marriage to my daughter, Julia May Riggs, and since her death has been that of an affectionate son to a loving mother, and I deeply respect him for this evidence of continued kindness during the years I have known him; even though he was married to my daughter for a period of less than two months preceding her death. It is my suggestion that Frank Mcgonagill use this money to assist him and his wife, Willie Mae McGonagill, in the education of their three children, Mary Caroline McGonagill, Frank Ellis McGonagill, Jr., and Betty Mae McGonagill, or as many of them as may need such assistance in completing their high school education.

"Second: I will, devise and bequeath unto Frank and Willie Mae McGonagill, husband and wife, Mary Caroline McGonagill, Frank Ellis McGonagill, Jr., and Betty Mae McGonagill, the children of the said Frank McGonagill and wife, Willie Mae McGonagill, personal property owned by me as follows:

"(a) Unto Frank and Willie Mae McGonagill, husband and wife, all of my furniture, fixtures, table service, et cetera found in my apartment oc-cupied by me at the Melrose Hotel in Dallas, Texas or wherever I may be residing at the date of my death; which I hope may be of some service and convenience in their little home. And, when my death occurs I want Frank McGonagill to come and pack everything up in his own way and take it home with him to save expense.

"(b) Unto Mary Caroline McGonagill and Betty Mae McGonagill, daughters of Frank McGonagill and wife, Willie Mae McGonagill, I leave all of my wearing apparel and all of my jewelry owned by me at the date of by death to be appraised as to value and divided equally, as nearly as that may be done, between them.

"(c) Since the jewelry I have is not suitable for a young man, I direct my executor, hereinafter named, to pay to· Frank Ellis McGonagill, Jr. in cash an amount which will be equivalent to one-half (½) of the total value of the jewelry received by Mary Caroline McGonagill and Betty Mae McGona-- gill.

## "Item Sixth

\* \* \* \* \* \*

## "Item Seventh

"After my instructions and directions have been fully carried out by my executor, hereinafter named, according to the terms and conditions set forth in Items Third, Fourth, Fifth and Sixth, as nearly as it is possible for said executor to comply with the same,. then:

## "Item Eighth

"I hereby *will, devise* and *bequeath* unto C. C. Walsh of Dallas, Texas *my long-time counselor and business adviser,* all of the remainder of my estate which may be left on hand after fully complying with Item Seventh.

"In making the above disposition and leaving to the said C. C. Walsh the entire residue of my estate, after Items Third, Fourth, Fifth and Sixth have been fully met and satisfied, I do so for the following reasons:

"For many years, while a resident of San Angelo, Texas and a citizen of Dallas, Texas, C. C. Walsh has been *my business manager and adviser*, during which time he has had complete charge and control of my *business affairs* and has handled them in such an efficient and satisfactory manner that I have never lost a penny in principal or interest in any investment that he has ever made for me. Since taking charge of my business affairs, when my real estate was covered with heavy indebtedness and mortgages and when I was threatened with foreclosure proceedings on my store buildings, he came to my rescue and since that time has cleared my estate of all of the heavy indebtedness existing at the time he took charge of the same. He has wisely invested other funds received from the sale of real estate, sold on his recommendation at an opportune moment, so that for years I have had the pleasure of a good support from my income; *which has brought me that peace of mind and happiness coming by reason of the conscious knowledge that I owed no man a dollar, that all of my debts had been liquidated, and that I had an income sufficient to support me, while not perhaps in luxury, but in comfort, and a peace of mind which I had not experienced for many years prior to the date that he took charge of my business affairs.*

"For all these valuable services rendered by C. C. Walsh in my behalf from year to year, *he has received not one penny of remuneration. In fact, he has consistently refused to receive any kind of remuneration for the services rendered, although I have tried to remunerate him time and time again; he always declined to accept anything, giving as his explanation of such refusal that I needed the money worse than he did and would continue to need it during the remainder of my life.*

"*In view of the statements herein made by me*, it is my *expressed desire and my final wish that* C. C. Walsh shall have and receive out of my estate all that remains after the bequests hereinabove mentioned have been liquidated. Even this would be a small compensation for the long and faithful services he has rendered to me in the years past. I make these statements for the reason that if it had not been for the unusual kindness, help and assistance rendered by C. C. Walsh in my behalf during all these years, I would have been left without an income, without a home in which to live, and without the means of maintenance and support in my advancing years, and I desire to show my *appreciation and gratitude* for these services *by giving him what is left of my estate at the time when I have no longer use for the same;* nor is there anyone unto whom I could *leave it* who is more entitled to *receive it.* (Emphasis supplied.)

"Item Ninth

"I hereby nominate, constitute and appoint the said C. C. Walsh of Dallas, Texas, as my Independent Executor of this my Last Will and Testament, without bond of any character or description, * * *."

The record evidence further shows that Mr. C. C. Walsh died testate on February 23, 1943; his will was in due time probated upon application of his wife, Mrs. Emma Walsh; and she was appointed independent executrix of his will and trustee of his estate. She filed inventory, appraisement and list of debts and claims, in which no debt or claim was listed against Mrs. Riggs in favor of her husband or his estate, and no mention made of the purported will of 1939. On May 19, 1947 Mrs. Riggs died testate, and on application of W. B. Harrell her will was duly probated on June 27, 1947, in which will Mr. Harrell was appointed executor of her estate. This will of Mrs. Riggs, pertinent here, reads:

"Know All Men By These Presents: That I , Mrs. John F. Riggs, a resident of Dallas County, Texas, a widow and more than twenty-one years of age, do hereby make, publish and declare this

my last will and testament, hereby revoking all other wills by me heretofore made.

## "I.

"Mr. Nathan Adams, now Chairman of the Board of the First National Bank in Dallas, Texas, and Mr. David C. Reed, now Assistant Trust Officer of said Bank, have been and are kind to counsel me and give me the benefit of their services in my business affairs. *Friends in need are friends indeed.* When Mr. Adams first began to give me counsel and advice, I offered to pay him, but he said 'That is not my business.' I asked him to let me pay Mr. Reed, who often came to my apartment in Melrose Court to bring papers for me to sign in regard to my business affairs, but Mr. Adams said, 'I pay him.' That was no friendly gesture. Mr. Adams never heard of me. The bequests I give them are so little, while they have done so much for me, which I deeply and greatly appreciate.

## "II.

"I give, devise and bequeath to Mr. Nathan Adams, absolutely and in fee simple, the store building and the lot on which it is located on North Chadbourne Street in San Angelo, Texas, known as store building No. 12, and now occupied by what is known as the Boston Store.

## "III.

"I give, devise and bequeath to Mr. David C. Reed, absolutely and in fee simple, the store building and the lot on which it is located on North Chadbourne Street in San Angelo, Texas, known as store building No. 10, and now occupied by what is known as Allen's Music Store.

## "IV.

"I give, devise and bequeath to Mr. Frank McGonagill, Jr., of 2129 Edwin Street, Fort Worth, Texas, absolutely and in fee simple, the store building and the lot on which it is located on North Chadbourne Street in San Angelo, Texas, known as store building No. 14, and now occupied by what is known as the Jolly Beauty Shop.

## "V.

"All other property of every kind which I own and possess at my death, including any special bequest or bequests which cannot vest as I have directed, shall be reduced to cash by my executor or the administrator of my estate, and the cash on hand at my death and the cash received from the sale of all other property shall be paid and distributed as follows:

"(a) All of my debts shall first be paid.

"(b) I give, devise and bequeath Five Thousand ($5,000.00) Dollars to Mrs. Emma Walsh, the widow of the late Colonel C. C. Walsh, who now resides at 3606 Crescent Avenue, Dallas, Texas, if she survives me; if she predecease me the Five Thousand ($5,-000.00) Dollars bequeathed to her shall be paid and distributed as other property and as I direct in paragraph (d) below.

"(c) In memory of my sister, the late Mrs. M. B. Adams of Tyler, Texas, I give, devise and bequeath Five Thousand ($5,000.00) Dollars to the Marvin Methodist Church at Tyler, Texas.

"(d) After all my debts, taxes and the costs and expense of administering my estate, including the fee allowed the executor or administrator, have been paid, I give, devise and bequeath the balance remaining to The American National Red Cross. The executor or administrator of my estate shall pay the money to The Dallas Chapter of the American Red Cross, Dallas, Texas, with a written statement that I made the gift and bequest in memory of my late husband, Dr. John Fielding Riggs, and of my daughter, the late Mrs. Julia May (Riggs) McGonagill, and directed that the funds be used exclusively for the purposes and uses of blood plasma.

"VI.

"I hereby name and appoint W. B. Harrell as Independent Executor of this will and of my estate, * * *.

"In witness whereof, I hereunto subscribe my name this, the 29th day of April, 1946, in the presence of Mrs. J. P. Lightfoot and Jerry C. Taylor who at my request attest the same.

"(Zaidee Trevanion)
Mrs. John F. Riggs
Testator

"Attest: Jerry A. Taylor
Mrs. J. P. Lightfoot."

This suit was filed on June 4, 1948. Trial was to a jury and on conclusion of the evidence the plaintiff and defendants each filed motion for instructed verdict. The defendant's motion was overruled; plaintiff's motion in part sustained.

The jury found, (1) that C. C. Walsh expected through provisions of Mrs. Riggs' will (1939) that he would receive compensation for his services rendered her; (2) that such expectation to receive compensation was induced by statements of Mrs. Riggs to C. C. Walsh; (3) that Mrs. Riggs agreed with C. C. Walsh that she would will all of her estate to C. C. Walsh, except certain specific bequests, as compensation for services rendered and to be rendered by him to Mrs. Riggs; (4) that C. C. Walsh agreed to accept the bequest as compensation for such services; (5) that Mrs. Riggs executed the will of 1939; (6) that Mrs. Riggs agreed with C. C. Walsh that she was executing such will for the purpose of compensating him for his services rendered and to be rendered for her by said C. C. Walsh; (7) that C. C. Walsh agreed with Mrs. Riggs to accept the provisions in such will as payment for such services; (8) that the reasonable market value of the properties owned by Mrs. Riggs at the time of her death was the sum of $55,000; (9) that Mrs. Riggs and C. C. Walsh agreed that Mrs. Riggs would provide in her will to compensate C. C. Walsh for services rendered by him for her; and (10) $40,000 is reasonable compensation for the legal, financial and business services rendered Mrs. Riggs by C. C. Walsh.

On the verdict of the jury the trial court, after overruling the defendants' motion non obstante veredicto and motion for new trial challenging the findings of the jury as having no support in evidence and against the evidence; and further that the plaintiff's claim, if any, was barred by the two and four-year statutes of limitation and in violation of the Statute of Frauds; and, in addition, all alleged rights or claims of the plaintiff under the purported contractual will of 1939 lapsed and all rights thereunder forfeited on the death of C. C. Walsh on December 23, 1943; and were effectively revoked by Mrs. Riggs in her will of 1946.

After overruling the plaintiff's motion for judgment for title and possession of all properties of the estate, real and personal, and, in the alternative, for damage in the sum of $55,000 (the reasonable value of the property belonging to Mrs. Riggs at the time of her death as found by the jury), the trial court entered judgment in favor of the plaintiff against W. B. Harrell, in his fiduciary capacity, and against the estate of Mrs. Riggs in the sum of $40,000 together with 6% interest from the date of judgment, as the reasonable value of Mr. Walsh's services rendered to Mrs. Riggs, and for the collection of said judgment execution was directed against the said W. B. Harrell, executor, and against the estate of Mrs. Riggs, deceased; all costs jointly and severally against all defendants.

To the aforesaid judgment the plaintiff and the defendants each excepted; plaintiff, to the action of the trial court in declining to render judgment for her for all of the estate, less the specific bequests, and in refusing to render judgment in favor of her for $55,000 as damage instead of $40,000 as found by the jury; and to that extent the plaintiff duly reserved her right of cross-appeal under appropriate assignments of error and cross points. The defendants excepted to the judgment in line with their motions, supra, for peremptory instruction, for judgment notwithstanding the verdict of the jury, and for new trial. To the overruling of said motions the defendants re-

936

served proper assignments and present here due points of error germane thereto.

The plaintiff in cross-appeal rests her case upon the legal concept that the unsigned carbon copy of the document having been executed by Mrs. Riggs in 1939 as an irrevocable will executed in confirmation of an oral contract, or quantum meruit, between C. C. Walsh and Mrs. Riggs; in that, Mrs. Riggs executed the 1939 will in full payment, release and satisfaction of a promise to Mr. Walsh for all claims for services rendered her; and that Mr. Walsh accepted the bequest in the will as remuneration for hired services implied. In brief, that Mr. Walsh was a hireling, a mercenary, and Mrs. Riggs an agreeable legal obligor.

 There is nothing in this record of probative value showing there existed an obligatory contract between these two deceased parties. The purported will itself does not imply or import a contract to execute it and the evidence is clear that Mr. Walsh made no charges for his services. He repeated that fact many times. And there is no evidence that Mrs. Riggs entered into legal obligation to make the bequest to him. The purported will from its four corners speaks for itself, a gratuitous benefaction. The purpose formed in her own mind was a grateful gift for the expressed philanthropical services rendered her by Mr. Walsh.

There is no doubt, as reflected from this record, that Mr. Walsh entertained the natural creative impulse that Mrs. Riggs, a lonely woman of 75 or 80 years of age, without kith or kin, would remember him in her will; she had no other one worthy of such gift at that time to leave it to. Thus he had a right to expect of Mrs. Riggs to give him "something" as a grateful remembrance.

The 1939 document clearly shows Mrs. Riggs' appreciation and nothing more; and had Mr. Walsh not predeceased her, there is no doubt but that the gift to him as reflected in the purported will would have vested title in Mr. Walsh in absence of revocation to all the residuary bequest as provided therein. The bequest to Mr.

Walsh was prompted, as was that to the other beneficiaries (her sister, Mrs. Adams, and her former son-in-law, Mr. McGonagill and his children by subsequent marriage), and at the death of Mr. Walsh, as was at the death of Mrs. Adams, the bequest being personal to them, lapsed. Amos v. Amos, Tex.Civ.App., 217 S.W.2d 902. Then, too, the subsequent 1946 will expressly revoked all prior wills theretofore made by her in which Mrs. Walsh was given a remembrance as a friendly gesture in the sum of $5,000, which in the instant case she does not repudiate; and to the other beneficiaries named therein she made substantial bequests as friendly tokens of gratitude and appreciation for services they also rendered her. There is no intimation that either of the subsequent beneficiaries was prompted by contract or legal liability on the part of Mrs. Riggs to remember them. She expressed her friendly and grateful appreciation in terms comparable to those she expressed to Mr. Walsh in the first purported will.

Based upon the allegations in plaintiff's petition that Mrs. Riggs executed the 1939 document in consummation of, and in accord and satisfaction of an agreement entered into between C. C. Walsh and herself, and that Mr. Walsh accepted the bequest set forth in the instrument in "full payment, release and satisfaction," etc., of all claims for services rendered, the burden rested on the plaintiff to show, somehow, somewhere, between 1920 and 1943, some incident from which it could be implied that these two deceased persons (Mrs. Riggs and Mr. Walsh) did not intend the document to be a revocable will. If, forsooth, it could be distorted as a contract, express or implied, representing an agreement by Mrs. Riggs to make an obligatory contract to become due and payable at her death, could it reasonably be held that Col. Walsh would have drafted it in form of a will, and that, too, in language lapsible at his death, or subject to be revoked at the instance of the maker? If such was his intention or design, in absence of pleadings and evidence of fraud, accident or mistake, same cannot be altered, varied, or changed from its plain intent

and meaning by contemporaneous or prior parol evidence.

The document of 1939 is not ambiguous or impressed with covenants of contract, hence the testatrix and her lawyer-draftsman intended the instrument to function as is clearly implies,—as a will. Mrs. Riggs said at the time of the execution of the purported will, "It is my will and testament; I have done something today I've wanted to do for years, but you (speaking to Mrs. Weis)· know how you keep putting things off; that is the way I want it and that is the way I am going to have it." These declarations coupled with the declarations of Mr. Walsh that he repudiated all contract of hire, and considered the bequest only as a token of appreciation and gratitude, show that he only "expected something" as a gracious gift.

In Dyess v. Rowe, Tex.Civ.App., 177 S.W. 1001, 1004 (writ ref.), Justice Fly of the San Antonio Court of Appeals, reviewing a record of parol evidence as in the case at bar, said:

"So in this case decedents only expressed their gratitude to appellee for his services and a desire to recompense him, but there was no admission of a contract to pay him through a will, or that there was any legal liability upon their part to pay a debt to appellee. It must be kept in mind that appellee pleaded an express contract on the part of the decedents to bequeath property to him. There is not one item of testimony tending to show that any such contract was ever dreamed of by decedents. The most that can be obtained from the testimony is an implied contract to pay for services and was not pleaded, and, if it had been, a claim based on such a contract would be . barred by limitations within two years. If there was only an implied contract to pay for the services, there could have been no contract to pay through a will, * * *."

It is difficult to trace the theories advanced by the appellee where C. C. Walsh often repudiated any contract of hire and permitted much of the usual and customary chargeable fees for such services which he had rendered to Mrs. Walsh to become barred by limitation, and, even more, a contract or will which Mrs. Riggs could, after his death, breach or revoke in making a new will. Such theories find support only by assuming that Mr. Walsh was hired to write her will and in doing so placed it beyond his client's power to make a later or different will. There being no evidence of any such contract, there can be no breach. All of the theoretical contractual relations terminated upon Mr. Walsh's death and this suit having been filed on June 4, 1948, nothing survived him upon which suit should have been brought after two years following the qualification of Mr. Walsh's executrix. Scott v. Walker, 141 Tex. 181, 170 S.W.2d 718. Even if a parol contract had been specific, definite, cleverly worded, such would not have been sufficient to vest a right or title of Mrs. Riggs' estate in Mr. Walsh. A contract to make a will to dispose of property to certain beneficiaries is a contract to convey and must conform to the Statute of Frauds. Henderson v. Davis, Tex.Civ.App., 191 S.W. 358; Hauser v. Zook, Tex.Civ.App., 278 S.W. 518; Walker v. Scott, Tex.Civ.App., 164 S.W.2d 586, reversed on other grounds 141 Tex. 181, 170 S.W.2d 718; Barrow v. Webb, Tex.Civ.App., 208 S.W.2d 157; Johnson v. Black, Tex.Civ.App., 197 S.W.2d 523, n. r. e.

Believing the case has been fully developed and that nothing would be gained by remanding it, we reverse and render same in favor of the appellants; it is so ordered.